IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

CECILIO MERCEDES DE LA CRUZ [2],

Defendant.

CRIMINAL NO. 12-693 (FAB)

## REPORT AND RECOMMENDATION

## INTRODUCTION

On September 27, 2012, Cecilio Mercedes De La Cruz [2] ("Mercedes") was charged in a two count Indictment.   Count One charged Mercedes with, from on or about September 16 through 17, 2012, in this district and elsewhere within the jurisdiction of this Court, and codefendants Jose Miguel Guzmán De Los Santos and Víctor Manuel Carela, did knowingly and intentionally combine, confederate and agree, with other persons known and unknown to the Grand Jury, to possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine in violation of Title 21, United States Code, Secs. 846 and 841(a)(1) and (b)(1)(A)(ii). Count Two charged Mercedes with, from on or about September 16 and 17, 2012, in this district and elsewhere within the jurisdiction of this Court, and codefendants Jose Miguel Guzmán De Los Santos and Víctor Manuel Carela, did knowingly and intentionally, with other persons known and unknown to the Grand Jury, possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine in violation of Title 21, United States Code, Sec. 841(a)(1) and (b)(1)(A)(ii). (Docket No. 29).

_____

Mercedes' first jury trial concluded with a hung jury because the jury was not able to reach a unanimous verdict.    (Docket No. 165).    Mercedes' second jury trial ended with a conviction as to both counts. (Docket No. 218).

On January 22, 2014, Mercedes was sentenced to one hundred and thirty six (136) months of imprisonment and a supervised release term of five (5) years.    (Docket No. 277 and 280).    Mercedes timely appealed his conviction and sentence.    (Docket No. 284).

On May 26, 2015, the Court of Appeals for the First Circuit issued an Opinion, finding that defense counsel was ineffective for failure to timely file a motion to suppress. The Court of Appeals also found the District Court committed a sentencing error.    As such, Mercedes' conviction and sentence were vacated and the matter was remanded to the District Court for further proceedings consistent with the Opinion.    (Docket Nos. 325 and 326).    On June 18, 2015, the Mandate was issued.    (Docket No. 327).

Upon remand, the District Court assigned new counsel to Mercedes under the Criminal Justice Act.    (Docket No. 329).    The District Court established a deadline to file a motion to suppress and a deadline to file a motion for change of plea.    (Docket No. 348).

On December 31, 2015, Mercedes filed a motion to suppress arguing that his post-arrest statements and all evidence derived therefrom were fruits of the poisonous tree and should be suppressed, because the arresting officer lacked probable cause for Mercedes' arrest. Mercedes based his motion to suppress on the facts presented during the second

_____

jury trial. (Docket No. 349).

On January 12, 2016, the Court referred the motion to suppress to the undersigned for hearing and report and recommendation.    (Docket No. 351 and 352).

After some procedural matters, the hearing on the motion to suppress started on March 3, 2016.   The Government called HSI/CBP Agent Javier López ("Lopez").   Direct and cross-examination were conducted. Several exhibits were presented and admitted into evidence.   (Docket No. 359).

On May 4, 2016, the suppression hearing continued, after a continuance was requested and granted. The Government called HSI SA Andrés Bachier-Serrano ("Bachier"). Direct and cross-examination were conducted. Several exhibits were presented and admitted into evidence. The Government also called PRPD Officer Wilfredo Vega-Flecha ("Vega").   Direct and cross-examination conducted.   The parties then stipulated the testimony at trial of HSI criminal investigator Angel Ortiz ("Ortiz"), who took Mercedes' post-arrest statements.    Defendant Mercedes did not take the stand nor did he present any evidence on his behalf.    Both parties rested.   The Court requested simultaneous briefs once the transcripts of the suppression hearing were filed.    (Docket No. 368).

On December 14, 2016, both parties filed their briefs after requesting and being granted several extensions of time.    (Docket Nos. 382 and 383).

On January 13, 2017, the Court ordered the parties to jointly submit the stipulated testimony of Ortiz which had still not been submitted.    (Docket No. 385).

_____

On January 19, 2017, in compliance with the Court's Order, the parties submitted the testimony of Ortiz at both jury trials as stipulated. (Docket No. 387).

## FACTUAL BACKGROUND

Mercedes did not present any evidence on his behalf during the suppression hearing. As such, for judicial economy and in light of its accuracy, the "Factual and Procedural History" of the Government in its Memorandum (Docket No. 382, pp. 4-28), which is supported by reference to the evidence presented at the suppression hearing and the stipulated testimony of Ortiz, is incorporated herein by reference and made part of this Order. Those portions only supported by reference to the evidence presented during the first and second jury trials are not considered herein nor incorporated by reference. This Report and Recommendation is exclusively based on the evidence presented during the suppression hearing and the stipulated testimony of Ortiz.

It should be noted that the Court of Appeals for the First Circuit made some expressions and findings in its Opinion (Docket No. 325) about the possible merits if a motion to suppress would have been originally timely filed in this case by former defense counsel. Those findings were based on the evidence presented during the second jury trial, which was the conviction Mercedes appealed. This case was remanded by the Court of Appeals for the First Circuit for further proceedings and defendant Mercedes was allowed to file a motion to suppress and a suppression hearing was held. As such, this is a whole new ballgame. In other words, this Report and Recommendation is based exclusively on the evidence presented during the suppression hearing which, as

_____

recognized by the Government, presented additional evidence (not presented at trial) to develop the reasonableness of the stop and arrest of Mercedes.   The stipulated testimony of Ortiz is also being considered.   This supplemental evidence now presented was not necessary at trial because the probable cause for the arrest was not challenged. (Docket No. 382, pp. 12 and 24, footnotes 1 and 2). Hence, the District Court now has a fully developed record (which includes additional evidence) to entertain the suppression issue. Consequently, the findings made by the Court of Appeals for the First Circuit as to the possible merits of a motion to suppress, are recognized and highly respected at that stage of the proceedings but not understood to limit or bind the District Court at this stage of the proceedings after the suppression hearing was held and new evidence was presented.

## LEGAL DISCUSSION

Defendant Mercedes avers in his motion to suppress that there was no Terry stop in this case because he was immediately arrested since he was thrown to the dirt, face down, handcuffed and was not free to leave. Defendant Mercedes claims his arrest was unlawful because there was no probable cause.   As such, all his statements and evidence should be suppressed as fruits of the poisonous tree.

In turn, the Government posits the law enforcement officers, based on prior intelligence and their observations, had reasonable suspicion to believe that a drug smuggling venture was ongoing when they found Mercedes. Mercedes was immediately detained and frisked for security purposes. During his security frisk, Mercedes was found to be wet and admitted, in a foreign accent, his involvement. Thus, what started as a Terry

_____

stop based on reasonable suspicion, evolved into an arrest based on probable cause. The Court agrees.

## A.    Investigatory Stop based on Reasonable Suspicion.

The issue of whether the stop of Defendant Mercedes was legal and based on reasonable suspicion, as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), is first addressed.    An investigative stop, also known as a Terry stop, *see* Terry v. Ohio, 392 U.S. at 1, occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion.    Id. at 6, 88 S.Ct. 1868 (*citing* United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." Id.    The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. Id. To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997) (*citing* United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)).    To fulfill the second prong, the Court must examine the totality of the circumstances.    *See* United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); United States Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

_____

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops ... and ... 'de facto arrests.' " United States v. Maguire, 359 F.3d 71, 77 (1st Cir. 2004) (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)); see also United States v. Quinn, 815 F.2d 153, 156-62 (1st Cir. 1987)). Brief stops in order to determine the identity of a suspicious individual or to maintain the status quo while obtaining more information are permitted if reasonable in light of the facts known to the officers at the time. Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, (1972); Terry, 392 U.S. at 20-22, 88 S.Ct. at 1879-1880. A security frisk is, simply put, generally considered an integral part of a valid approach by an officer to an individual, whether or not there is probable cause for a search and seizure, provided that there are reasonable grounds to believe that the individual could be armed and dangerous. Adams, 407 U.S. at 143, 92 S.Ct. at 1921.

Therefore, the First Circuit has held that physical contact between an officer and an individual alone does not convert all investigative stops into a de facto arrest due to the dynamic nature of investigative stops. Maguire, 359 F.3d 71, 78 (citing Zapata, 18 F.3d at 975).   The fact that a person is put on the ground does not imply that there was a de facto arrest. Id., see United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998) (the officer's action of putting suspects on the ground and searching for weapons was within scope of Terry stop); United States v. Jackson, 918 F.2d 236, 238 (1st Cir. 1990) (the police could, within the scope of a Terry stop, block the suspect's exit from a vehicle to determine whether the suspects were armed).

When evaluating the validity of an intervention between and officer and an individual, the courts must consider all of the relevant circumstances. The circumstances dictating the officer's actions are "not to be dissected and viewed singly; rather they must be considered as a whole." United States v. Soares, 521 F.3d 117, 120 (1st Cir. 2008) (*quoting* United States v. Ivery, 427 F.3d 69, 73-74 (1st Cir. 2005)).   In determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.' " Soares, 521 F.3d at 120 (*quoting* United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004); United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994)).

Pursuant to the uncontested evidence presented during the suppression hearing, and taking into account that the testimonies of the three (3) law enforcement officers were consistent and corroborated each other, the initial stop of Mercedes was appropriate and reasonable at its inception.   The law enforcement agents' initial detention of Defendant Mercedes was legal inasmuch as, based on the totality of the circumstances, it was reasonable to believe that Mercedes was involved in criminal activity. Thus, as correctly argued by the Government, as the initial stop progressed based on reasonable suspicion, there was probable cause to arrest Mercedes, as fully explained below.

The uncontested evidence presented at the suppression hearing shows that Vega acted lawfully, out of concern for his safety and the safety of his fellow officers conducting the investigation of the dark and desolate area, when he stopped and immediately patted-

down Mercedes. Prior to encountering Mercedes, Vega and his fellow law enforcement agents had made observations that alerted them to the potential for danger.[1] The totality of the circumstances and the progression of the facts developed throughout the investigation the night of the events provided substantial evidence for any law enforcement officer to conclude that when Vega saw Mercedes in the dark area it was reasonable to believe that Mercedes was engaged in ongoing criminal conduct. *See* United States v. Am, 564 F.3d 25, 31 (1st Cir. 2009).

Examining the circumstances leading up to the stop of Mercedes, the Court recounts the relevant facts the law enforcement officers knew or could have reasonably inferred when they initially stopped Mercedes.

Prior to issuing the order to Mercedes to stop, Vega (a) had received reliable information from his fellow officers regarding a suspect van in the area; (b) received reliable information from fellow officers of the approach of a suspicious vessel to a protected cove known for prior drug smuggling activity; (c) received reliable information of the discovery and seizure of an Eduardoño type vessel; and (d) personally observed an abandoned Ford Excursion vehicle in the middle of the night in a desolate area with gasoline tanks and food provisions next to the abandoned vehicle.

---

[1] The First Circuit has recognized that reasonable suspicion or even probable cause can be established by the "collective knowledge" or "pooled knowledge" principle. *See, e.g.,* United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986) (finding probable cause for arrest on the basis of collective knowledge); United States v. Pardue, 385 F.3d 101, 106-07 (1st Cir. 2004). Accordingly, the "focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (quoting United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999)). Specifically, reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion. Burns v. Loranger, 907 F.2d 233, 236 n. 7 (1st Cir. 1990); *see also* Taylor, 162 F.3d at 18 n. 2 (finding that information regarding an informant's reliability can be imputed between officers "cooperating in an investigation") (quoting United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)).

United States of America v. Cecilio Mercedes De La Cruz
Criminal No. 12-693 (FAB)
Report and Recommendation
Page 10
_____

      The evidence presented during the suppression hearing shows that it is undisputed that law enforcement agents were conducting surveillance on the evening of September 16, 2012 along the southeast coastline of Puerto Rico, an area that included the beach front of Yabucoa and Maunabo, in expectation of the entry of a suspected drug smuggling vessel.  As testified by Vega during the suppression hearing, he and the other officers conducting the investigation, knew that the *modus operandi* of the drug smuggling venture under investigation consisted of using a vessel to enter a remote beach area to unload multi-kilogram loads of cocaine and to resupply that vessel with fuel and food supplies to complete a return trip to its place of origin. "According to my experience, [the full gas tanks and the food items are] to supply the incoming vessel with fuel in order for it to do its return trip." (Suppression Hearing Transcript ("SHT"), Docket No. 370, p. 46, lines 20-22 and p. 48, lines 5-6).

      During the late hours of September 16, 2012, the surveilling officers identified a white van engaged in a suspicious driving pattern in the Yabucoa and Maunabo coastline from on or about midnight until the early morning hours. (SHT, Docket 369, p. 93, lines 14-22). The law enforcement officers confirmed that the suspicious white van was not registered to a local area resident.  As explained during the suppression hearing, the movement of the van was deemed suspicious because it was moving continuously back and forth between Yabucoa and Maunabo along Road 901 which is close to the coast, made several stops in different areas and it was registered to someone in the metropolitan area in Barrio Obrero.   (Id, pp. 9-12).

Simultaneously with the identification of the white van, the law enforcement officers performing the surveillance identified a vessel traveling without navigational lights with three (3) individuals on board towards the Yabucoa and Maunabo area along the section of Road 901 where the suspicious van was driving along the coastline. The law enforcement officers confirmed, with fellow officers from the Puerto Rico Police Department, that said vessel was not an official vessel authorized to travel without navigational lights. Vega and the other law enforcement officers knew, based on their training and experience, that a vessel traveling without lights is a common tactic for vessels approaching the coastline to engage in concealed drug smuggling activities. (SHT, Docket No. 370, p. 35, lines 20-23). Pursuant to the evidence presented during the suppression hearing, the vessel traveling without navigational lights was one of the factors that Vega and the other officers conducting the investigation took into consideration to reasonably infer that the vessel was the target of a drug smuggling investigation.

CBP Officer López, who has years of training and experience in conducting surveillance of clandestine vessel movement, also identified the vessel as suspicious for being an unusually large Eduardoño-type-vessel. Vega and the other law enforcement officers on scene knew, based on their training and experience, that these Eduardoño-type-vessels were commonly used to complete drug smuggling ventures due to their particular design features. (SHT, Docket No. 369, p. 76, lines 13-15).

Pursuant to the evidence presented at the suppression hearing, Vega, López and other law enforcement agents were aware that five (5) or six (6) previous investigations

had been conducted in the southeastern coastline area of Puerto Rico where Eduardoño-type-vessels had been used to unload multi-kilogram loads of cocaine on desolate beach areas.  (Id, pages 6-7 and 24-25).   To this effect, HSI SA Bachier testified during the suppression hearing that he participated in an undercover drug smuggling investigation between 2011 and 2012 where the landing site of the Eduardoño-type-vessel on September 17, 2012 in this case was specifically chosen to be used as the landing site of a muti-kilogram of cocaine load. (SHT, Docket No. 370, p. 14).    This fact further corroborated for Vega, as it would for any reasonable officer, that they were investigating an imminent off-loading of a multi-kilogram drug smuggling venture in the Yabucoa and Maunabo coastline area.

Additionally, the topography and secluded nature of this area made it suitable for drug smuggling activities to be undetected. As the testimonial and documentary evidence introduced at the suppression hearing shows, the landing area towards which the Eduardoño-type-vessel was heading is a protected cove that had a limited entry access and was protected from any line of vision. (SHT, Docket No. 369, p. 40, lines 11-25). "[I]f you go in with a vessel right there where they landed, there's no way from any side that you can see the vessel. Even from [Road] 901, you don't see the coast in that corner." (Id, p. 44, lines 1-4; and SHT, Docket No. 370, p. 14, lines 19-22). This specific landing area was also an undeveloped, rocky beach area without any type of docking facilities. (SHT, Docket No. 369, p. 98, lines 19-21 and p. 100, lines 6-7; and SHT, Docket No. 370, p. 24, lines 17-21).

_____

Accordingly, the Court agrees with the Government's contention that the fact that "Las Minas" sector had been previously used to conduct drug smuggling ventures due to its topography and secluded nature would lead any reasonable officer to infer that the vessel was approaching this secluded beach area in the early hours of the morning in total darkness, without navigational lights, to complete an illegal drug smuggling venture. This fact contributes to the eventual determination of the law enforcement agents to intervene with, and later arrest Mercedes, contemporaneously with the vessel's approach, in the remote area where the landing of the suspect vessel was taking place.

When Vega learned about the direction taken by the suspicious vessel along the Yabucoa and Maunabo coastline, he went directly to "Las Minas" to search for the suspicious vessel. It is undisputed that, while searching for the suspicious vessel, Vega and the other law enforcement officers came upon an abandoned red Ford Excursion vehicle with the key in the ignition, its doors ajar and the hood still warm to the touch in the gravel road that led to the protected cove where the suspicious vessel was attempting to land. (SHT, Docket No. 369, p. 39, lines 15-19; SHT Docket No. 370 p. 45, lines 15-19 and p. 75, lines 12-14). The Court finds that it was a reasonable inference by Vega that, since the hood of the Ford Excursion vehicle was still warm, the vehicle had recently been used to reach its location at that time, and that the driver and other passengers could be close by. The fact that the Ford Excursion vehicle had then been abandoned by its occupants, leaving doors ajar and the contents of the vehicle around the brush (while a Police helicopter flew over the area), would also lead any officer to reasonably infer that

_____

the vehicle's passengers were still in the area and were involved in the developing drug smuggling activity taking place in close proximity to the abandoned vehicle.

Furthermore, the fact that the red Ford Excursion was found next to fifteen (15) full gas tanks that had been placed towards the beach area, and by food supplies that had been abandoned in the brush, also served to confirm that the officers had found, in this location and at this time, evidence of the ongoing drug smuggling venture. As testified by Vega and López, and correctly summarized by the Government, the *modus operandi* of the drug smuggling venture under investigation consisted of using a 30-35 feet Eduardoño-type-vessel with two (2) engines entering a remote beach area to unload multi-kilogram loads of cocaine and, then, re-supplying that same vessel with fuel and food items to complete the return trip to its place of origin. Vega testified at the suppression hearing that he determined, based on his training and experience, that the food items and tanks full of fuel, found lined up towards to the expected landing site of the suspicious vessel, were evidence of the fact that the drug smuggling venture under investigation was underway. (SHT, Docket No. 370, p. 49, lines 7-8).

In turn, López reached the same conclusion as he testified during the suppression hearing that, based on his training and experience he was able to determine, upon the inspection of the size and type of fuel tanks found, that these were of the type of tanks generally used for storing fuel in boats. (SHT, Docket No. 369, p. 89, line 8).

Both Vega and López explained at the suppression hearing that the location of the red Ford Excursion vehicle, its size and condition, and the items found alongside the

vehicle also led them to the reasonable conclusion that this was a "get-away" vehicle for the ongoing smuggling venture. (SHT, Docket No. 370, p. 49, line 5). Vega and López both indicated during the suppression hearing that Vega and Guzmán were left behind to guard the red Ford Excursion vehicle because they believed it to be a "get-away" vehicle. The Court finds that this inference was consistent with the conclusions that any reasonable officer, aware of the facts and events known to Vega and López at the time, would have made under the circumstances.

The Court agrees with the Government that the nature of the suspected drug smuggling venture under investigation, the identification of a suspicious white van traveling along the coastline between Yabucoa and Maunabo while the Eduardoño-type-vessel approached the coastline area, and the size and quantity of the fuel tanks and the food items found alongside the red Ford Excursion[2] further led the law enforcement officers to reasonably infer that there was a group of individuals in the area, since it would take several persons to move these heavy items. As testified by Vega during the suppression hearing: "[b]ased on my experience and what I saw, there were many fuel gallons. And that's heavy. And the vehicle, based on the vehicle, there must have been many people, more than one." (Id, p. 51, lines 14-16). The Court finds that these conclusions were the ones that any reasonable officer in the same position would have reached.

---

[2] Vega testified at the suppression hearing that the food supplies found near the abandoned Ford Excursion vehicle were not from Puerto Rico or the United States. The food items had markings from Venezuela.   (SHT, Docket No. 369, p. 57, lines 3-5).

Moreover, the choice of the location and the time of day, a desolate dark wooded area close to the coast line in the middle of the night, also confirmed the reasonableness of the officers' determination that a drug smuggling venture was in progress.[3] All of these facts, combined with the topography of the area and the lack of illumination, also created a heightened danger for the officers conducting the investigation. "[L]aw enforcement officers know from experience that firearms are often found in the presence of illegal drugs." Jackson, 918 F.2d at 240 (citing United States v. Walters, 904 F.2d 765, 769 (1st Cir. 1990) ("in drug trafficking[,] firearms have become 'tools of the trade'"); accord United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989)).

Thus, the totality of circumstances provided evidence for Vega and his fellow law enforcement officers to reasonably believe that the participants of the suspected ongoing drug smuggling venture would be armed. As a matter of fact, Vega testified at the suppression hearing that, drug activity creates a security concern because "[i]f there are drugs, there's weapons. If there's weapons, there's danger. And we have to take care of safety first before we take actions." (SHT, Docket No. 369, p. 56, lines 14-18).

Turning to the location of Mercedes, he was found in total darkness in a creek bed approximately 135 feet from the abandoned Ford Excursion vehicle which had been already identified as part of a suspected ongoing drug smuggling venture because of the

---

[3] While location on its own is insufficient to create reasonable suspicion, it "is clearly a consideration that a police officer may use to decide to make a Terry stop." Am, 564 F.3d at 30; Kimball, 25 F.3d at 7; see also Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation).

items found alongside the vehicle, its warm hood, its key in the ignition and its doors ajar.
(SHT, Docket No. 370, p. 46, lines 20-22). When Vega observed Mercedes in the darkness,
Mercedes was not carrying any flashlight, illumination device nor an orientation device.
Neither was Mercedes carrying with him any recreational item for fishing, camping,
hunting and hiking, for example.   (Id, p. 94, lines 4-20).   Mercedes was observed by
Vega walking towards the abandoned Ford Excursion vehicle, instead of walking up the
adjacent gravel trail. (Id, p. 79, lines 14-17). As testified during the suppression hearing,
none of the law enforcement officers had seen at that time any other individual in the area
and they had not seen any human activity at the houses located over a quarter of a mile
away. (SHT, Docket No. 369, p. 100, lines 8-14). However, the law enforcement officers
were aware, at that time, that the suspicious vessel that had approached the protected
cove approximately 500 feet away had at least three (3) occupants and that at least a
fourth individual would have driven the red Ford Excursion vehicle to the place where it
was located. (SHT, Docket No. 370, p. 75, lines 12-14).   In addition, when Vega saw
Mercedes for the first time, López had already provided to Vega the information he
(López) received from the FURA helicopter that the vessel had landed and three (3)
individuals jumped out of the vessel to the shore. (SHT, Docket No. 369, pages 84-85 and
87-88).

As testified by Vega during the suppression hearing, he seized Mercedes when he
placed him on the ground to conduct the security frisk after giving him the order to stop.
This action does not necessarily imply that there was a *de facto* arrest at that moment in

_____

time. <u>Maguire</u>, 359 F.3d at 78; <u>Taylor</u>, 162 F.3d at 21 (holding that officer's action of putting suspects on the ground and searching for weapons was within the scope of a <u>Terry</u> stop). When officer safety is a legitimate concern, the use of prophylactic measures like application of handcuffs, effecting a stop at gunpoint, or ordering a suspect to the ground does not transform every stop into a *de facto* arrest. <u>United States v. Pontoo</u>, 666 F.3d 20, 30-31 (1st Cir. 2011). *See* <u>United States v. Fornia-Castillo</u>, 408 F.3d 52, 64 (1st Cir.2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid <u>Terry</u> stop into a de facto arrest."); <u>United States v. Chaney</u>, 647 F.3d 401, 409 (1st Cir. 2011). "In a world fraught with peril, officer safety must have a place at the forefront of police work. It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer 'has reason to believe that the suspect is armed and dangerous.' " <u>Pontoo</u>, 666 F.3d at 30 (citing <u>Williams</u>, 407 U.S. at 146, 92 S.Ct. at 1923).

Based on these circumstances, the Court agrees with the Government's assertion that any law enforcement officer, with similar training and experience as Vega (with his familiarity with the area and with knowledge of a suspected drug smuggling in the middle of the night), would have concluded that it was suspicious for Mercedes to be wandering around the remote and desolate wooded area at that time of the night unless he was a participant of the drug smuggling venture the agents reasonably believed was ongoing at that location. As explained by both Vega and Bachier, "Las Minas" area is a desolate and undeveloped rocky beach in which they had never witnessed individuals engaged in recreational activities like bathing, hiking, fishing or snorkeling during the years that they

had visited the site to conduct their investigations, much less in the middle of the night. (SHT, Docket No. 370, p. 16, lines 10-14).

Therefore, there was reasonable suspicion for Vega to infer that Mercedes was a participant of the ongoing suspected criminal activity and to order him to stop and conduct a security frisk based on the following: (a) Vega's observations of the abandoned Ford Excursion vehicle at the desolate brushy location that night close to fifteen (15) full gas tanks and diverse food supplies, (b) the information provided to Vega by his fellow law enforcement officers about the suspicious driving pattern of the white van along the coast line, (c) the Eduardoño type-vessel that approached the protected cove, (d) the three (3) individuals who jumped from said vessel to the shore, (e) Vega's experience as a local law enforcement officer who investigated prior drug smuggling ventures by boat in that area, and (f) his personal observation of Mercedes walking towards the abandoned Ford Excursion vehicle in the dark.

Mercedes makes much of the fact that he was allegedly immediately restrained on the ground during the security frisk. As such, Mercedes claims there was no Terry stop but an arrest without probable cause. However, the Court of Appeals for the First Circuit has recognized physical contact between an officer and a suspect does not convert the stop into a *de facto* arrest due to the dynamic nature of investigatory stops.   Maguire, 359 F.3d 71, 78.[4]   The Court agrees with the Government's contention that there was not an

---

[4] The fact that a person is put on the ground does not imply that there was a *de facto* arrest. *Id.*, s*ee* Taylor, 162 F.3d at 21 (holding that officer's action of putting suspects on the ground and searching for weapons was within scope of Terry stop); Jackson, 918 F.2d at 238 (holding that the police could, within the scope of a Terry stop, block the suspect's exit from a vehicle to determine whether the suspects were armed).

United States of America v. Cecilio Mercedes De La Cruz
Criminal No. 12-693 (FAB)
Report and Recommendation
Page 20
_____

arrest in Mercedes' case at its inception but that it evolved into an arrest while conducting the security frisk that Mercedes was found wet and made some admissions, as explained in more detail below.[5]

The known facts and circumstances provided Vega, and would have provided to any reasonable law enforcement officer, the reasonable suspicion necessary to detain and frisk Mercedes. As proffered by the Government, any reasonable officer would be justified in believing that a person encountered in that area in the middle of the night in the vicinity of an apparently ongoing drug smuggling venture would be armed and dangerous. "The circumstances of this stop [were] such that any officer would have been 'foolhardy' not to have frisked [Mercedes] for weapons." *See* Id., 521 F.3d at 121 (quoting United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998)).

Finally, the Court notes that, even though Mercedes had an opportunity, no evidence was presented by him to rebut the testimonies of the law enforcement agents nor the documentary evidence presented by the Government during the suppression hearing. Defendant Mercedes did not take the stand. As such, the testimonies of the law enforcement agents are uncontested.[6]

In sum, under the totality of the circumstances and based on the personal

_____

[5] Where an investigatory stop is justified at its inception, it will generally not morph into a *de facto* arrest as long as "the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop." Chaney, 647 F.3d at 409 (quoting United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001)). *See also* United States v. Owens, 167 F.3d 739, 748 (1st Cir. 1999).

[6] The efforts of defense counsel to impeach the law enforcement officers in their cross-examinations were fruitless.

observations of the law enforcement officers that night, they had a reasonable, articulable suspicion about Defendant Mercedes' involvement in some criminal activity.    Thus, Defendant Mercedes' initial stop was valid and within the parameters of <u>Terry</u>, 392 U.S. at 21; <u>United States v. Chhien</u>, 266 F.3d 1, 6 (1st Cir. 2001).

As such, suppression on the above grounds is not warranted.

**B.    Warrantless Arrest.**

A warrantless arrest is constitutionally valid if, at moment the arrest is made, officers have probable cause to make it; that is, if at that moment, facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.    <u>United States v. Ayres</u>, 725 F.2d 806 (1st Cir. 1984); <u>Young</u>, 105 F.3d at 6 (same).    Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives.    <u>Id.</u>

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime, and on the other hand in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection.'"    <u>Brinegar v. United States</u>, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949).

A warrantless arrest requires probable cause, the existence of which must be

determined in light of the information that law enforcement officials possessed at the time of the arrest. *See* United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994). To establish probable cause, the Government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991); Meade, 110 F.3d at 193.

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999) and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

It is unquestioned that when a defendant is arrested, he may be searched both for evidence of his crimes and for the safety of the officers. "It is also well established that the defendant's lawful arrest permits the police to search his person . . ." Fiasconaro, 315 F.3d at 37. *See also* United States v. Doward, 41 F.3d 789, 792-93 (1st Cir. 1994). "[I]t is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant." Winchenbach, 197 F.3d at 552.

Vega testified during the suppression hearing that, once Mercedes was placed on

United States of America v. Cecilio Mercedes De La Cruz
Criminal No. 12-693 (FAB)
Report and Recommendation
Page 23
_____

the ground and patted down, he found Mercedes to be wet from his knees down. In addition, during the security frisk, Vega asked Mercedes two (2) questions that he failed to initially answer. Upon being asked again, Mercedes admitted, in a foreign Dominican accent, that he was at the location with four (4) other individuals who were not accompanying him at the time and that he received a $1,000 in payment for his participation. Mercedes was then lifted from the ground, handcuffed and placed under arrest.   While Vega was placing the handcuffs, he read Mercedes his <u>Miranda</u> warnings. (SHT, Docket No. 370, pp. 85 and 86).

      The Court finds that these two (2) additional facts that Vega noticed during the security frisk, under the totality of the circumstances and taking into account the facts that led Vega to the initial stop of Mercedes and his own observations, gave Vega probable cause to arrest Mercedes immediately after the pat down for participating in an ongoing criminal activity. The determination of whether probable cause exists must not rest on isolated facts but depends on the cumulative effect of the facts in the totality of the circumstances.   Probability, not a *prima facie* showing of criminal activity, is the standard.   <u>Draper v. United States</u>, 358 U.S. 307, 313, 79 S.Ct. 329, 333 (1959). The inquiry into probable cause to support an arrest is not necessarily based upon the offense actually invoked by the arresting officer, but upon whether the facts known at the time of arrest objectively provided probable cause to arrest.   *See* <u>United States v. Jones</u>, 432 F.3d 34 (1st Cir. 2005) (*citing* <u>Devenpeck v. Alford</u>, 543 U.S. 146, 125 S.Ct. 588 (2004)).

      In light of the above, the Court agrees with the Government that the facts presented

_____

at the suppression hearing support a determination that Vega's interaction with Mercedes started as less than an arrest and evolved into an arrest based on probable cause as a result of the findings during the <u>Terry</u> stop. Consequently, Mercedes' warrantless arrest was legal and based on probable cause.

## C.    Defendant Mercedes' Statements.

Defendant Mercedes posits in his motion to suppress and subsequent Memorandum that, when a Defendant makes inculpatory statements that are the product of an unconstitutional search and seizure, the statements are fruits of the poisonous tress and shall be suppressed based on the underlying constitutional violation.

As above explained, Defendant Mercedes' initial <u>Terry</u> stop was based on reasonable suspicion and his eventual arrest was based on probable cause.   As such, Mercedes' statements are not the results of an illegal arrest, search and seizure.    Hence, Defendant's request for suppression of his statements as fruits of the poisonous tree lacks a factual basis and is without merit.

As a matter of fact, Defendant Mercedes only claims that his statements were the fruit of the poisonous tree.    Defendant Mercedes did not allege in his motion to suppress, subsequent memorandum nor during the suppression hearing that the statements he provided to the law enforcement agents under custody were not knowing and/or involuntary or that they were given without him being advised of his <u>Miranda</u> rights. Defendant Mercedes has not alleged either that he was under coercion or duress when he waived his rights and made the inculpatory statements at the HSI offices.

_____

The uncontested testimony at the suppression hearing shows that Vega provided Mercedes his Miranda warnings at the scene when he was placing the handcuffs on Mercedes. (SHT, Docket No. 370, pp. 85 and 86).   In addition, the stipulated testimony of Ortiz at trial shows that Defendant Mercedes was transported from Humacao to the main HSI offices in Miramar, Puerto Rico. Upon arrival, Mercedes made some spontaneous statements about his involvement and he was immediately stopped by Ortiz from making further statements.    Then, Ortiz provided the Miranda warnings to Mercedes prior to being interviewed at the HSI offices in Miramar. Mercedes knowingly signed the Miranda warnings and waiver form after Ortiz read to him the form in Spanish and explained it contents to Mercedes. Mercedes indicated at the time that he understood his rights, knowingly waived his rights and made some admissions thereafter. (Docket No. 386, Exhibits 1 and 2).[7]

In view of the above, suppression fails on this ground as well.

## CONCLUSION

For the above state reasons, it is recommended to the Court that Defendant Mercedes' "Motion to Suppress" (Docket No. 349) be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.    Failure to file same within the specified time waives the right to

---

[7] No evidence was presented by Mercedes during the suppression hearing that he had a diminished mental capacity or disability, was incompetent at the time or was under the influence of drugs or alcohol when he gave his statements.

_____

appeal this order.   Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994);

United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).   *See* Paterson-Leitch Co. v. Mass.

Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would

be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party

were allowed to feint and weave at the initial hearing, and save its knockout punch for the

second round").

     In San Juan, Puerto Rico, this 20th day of January of 2017.

                    s/CAMILLE L. VELEZ-RIVE
                    CAMILLE L. VELEZ-RIVE
                    UNITED STATES MAGISTRATE JUDGE