# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| UNITED STATES OF AMERICA, | |
|---|---|
| **Plaintiff**, | |
| v. | **Criminal No.** 12-693 (FAB) |
| CECILIO MERCEDES DE LA CRUZ [2], | |
| **Defendant**. | |

**OPINION AND ORDER**

BESOSA, District Judge.

On September 27, 2012, a federal grand jury returned an indictment charging defendant Cecilio Mercedes-De La Cruz ("Mercedes") and his co-defendants, Jose Miguel Guzman-De Los Santos ("Guzman") and Victor Manuel Carela ("Carela"), with conspiring to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute in violation 21 U.S.C. § 841(a)(1). (Docket No. 29.) Defendant Mercedes' first trial concluded in a hung jury on April 22, 2013. At the second trial, the jury found defendant Mercedes guilty of both counts. (Docket No. 281.) Defendant Mercedes appealed his conviction claiming, *inter alia*, that his trial counsel rendered ineffective assistance. (Docket No. 284.) The First Circuit Court of Appeals ultimately vacated defendant Mercedes' conviction, and remanded the case for further proceedings upon concluding that "Mercedes'

trial counsel's failure to file a timely motion to suppress amounted to a constitutionally deficient performance." Upon remand, the Court assigned new counsel to defendant Mercedes pursuant to the Criminal Justice Act. (Docket No. 329.)

Before the Court is defendant Mercedes' motion to suppress statements made to law enforcement officials and evidence concerning the condition of defendant Mercedes' clothing. (Docket No. 349.) The Court referred the matter to Magistrate Judge Camille L. Velez-Rive. (Docket Nos. 351 & 352.) The United States opposed the motion, (Docket No. 382), and defendant Mercedes replied (Docket No. 383). The magistrate judge held a two-day hearing during which the United States and defendant Mercedes presented evidence and arguments. Additionally, the parties submitted the stipulated testimony of HSI Criminal Investigator Angel Ortiz ("Ortiz"), which the magistrate judge considered without objection from either party. (Docket No. 387.) Following the suppression hearing, the magistrate judge issued a Report and Recommendation ("R&R") recommending that the Court deny the motion to suppress. (Docket No. 388.)

Defendant Mercedes filed a timely objection to the R&R. (Docket No. 394.) The Court has thoroughly considered the submissions in support of, and in opposition to, defendant Mercedes' motion to suppress, the transcript of the suppression hearing, and the magistrate judge's R&R. For the reasons set forth

below, the Court **ADOPTS** the magistrate judge's R&R in its entirety, and **DENIES** Mercedes' motion to suppress. (Docket No. 349.

## I. STANDARD OF REVIEW

A district court may refer a motion to suppress evidence in a criminal case to a magistrate judge for a R&R. 28 U.S.C. § 636(b)(1)(B); Loc. R. 72(a)(6). Any party may file written objections to the R&R, and a party that files a timely objection is entitled to a *de novo* determination of those portions of the report to which specific objection is made. 28 U.S.C. § 636(b)(1); Loc. R. 72(d). In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); accord Loc. R. 72(d). [1]

## II. FINDINGS OF FACTS

The magistrate judge issued proposed findings of facts based exclusively on the evidence presented during the two-day suppression hearing, and on the stipulated testimony of Criminal Investigator Ortiz. (Docket No. 388 at 4.) Neither Mercedes nor the United States objected to the magistrate judge's factual

---

[1] When reviewing the denial of a motion to suppress, the First Circuit Court of Appeals reviews findings of fact for clear error and employs a *de novo* standard of review for legal determinations. United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011) (citation omitted). The First Circuit Court of Appeals will reverse the denial of a motion to suppress "only if the record, read as a whole, gives rise to a strong, unyielding belief that a mistake has been made." Id.

findings,[2] or to the fact that the magistrate judge declined to consider evidence presented during the first and second jury trials.[3] Accordingly, the Court hereby adopts the magistrate judge's factual findings and summarizes them as follows.

The United States Customs and Border Patrol ("CPB"), the United States Coast Guard, the Puerto Rico Police Department ("PRPD") and the Yabucoa Municipal Police Department initiated a joint investigation concerning a suspected drug smuggling venture along the coastal area of Yabucoa and Maunabo, Puerto Rico, on the evening of September 16, 2012. (Docket No. 382 at p. 4.) CBP

---

[2] The magistrate judge's factual findings incorporate by reference the United States' recitation of facts set forth at Docket No. 382 at pp. 4-28. (Docket No. 388 at p. 4.)

[3] The Court is mindful that the First Circuit Court of Appeals made some expressions about the possible merits of a suppression motion based on its review of the evidence presented during defendant Mercedes' second trial. See, e.g., Mercedes-De La Cruz, 787 F.3d at 68. Nonetheless, the evidence the United States presented at defendant Mercedes' second trial was not designed to convince either the Court or the jury that defendant Mercedes' detention was lawful, but that defendant Mercedes was guilty of the offenses charged in the indictment. See Docket No. 388 at pp. 4-5. As the magistrate judge recognized, the United States presented evidence during the suppression hearing which was not presented at trial, and which is pertinent to the reasonableness of Mercedes' detention and arrest. Id. Because the record is now more developed than it was when the First Circuit Court of Appeals considered the merits of defendant Mercedes' appeal, the Court does not consider itself bound by that Court's observation that a suppression motion "likely would have succeeded." See Mercedes-De La Cruz, 787 F.3d at 68.

Officer Javier Lopez ("Lopez")[4], who testified at the suppression hearing, received an intelligence briefing that law enforcement authorities expected a vessel to enter Puerto Rico with controlled substances along the coastline. Id. at p. 5. The area under investigation is a mountainous region, covered with heavy brush, and has served previously as a debarkation point for international drug traffickers. Id.

At approximately 10:00 p.m. Officer Lopez and other CBP agents set up a surveillance point near Punta Yegua in Yabucoa to scan the horizon for vessels. Id. at p. 6. Officers in plain clothes drove unmarked vehicles along Puerto Rico Road 901, a road that parallels the coastline and provides access to beaches and protected coves. Id. At approximately 12:00 a.m., CBP Officer Luis Capestany ("Capestany") observed a white Ford Econoline drive back and forth along Road 901, parking at different locations. Id. at p. 7. Capestany informed the CBP surveillance team about the white Ford Econoline. Id. The unusual driving pattern of the Ford Econoline in a remote area at the late hour of the night roused the suspicions of Officer Lopez and the CBP surveillance team. Id. at p. 8.

---

[4] Officer Lopez has 14 years of experience in criminal investigations with the CBP, personal knowledge of five or six prior investigations where Eduardoño-type vessels were used to smuggle drugs into Puerto Rico, and participated in two or three of these investigations. Id. at p. 9.

Having continued to conduct surveillance, at approximately 4:00 a.m. on September 17, 2012, Officer Lopez observed a vessel without navigational lights approach the coastline. (Docket No. 382 at p. 8.) CBP agents confirmed with the PRPD that the vessel was not authorized to travel without navigational lights. Id. Officer Lopez then requested helicopter assistance from the PRPD to investigate and intercept the vessel because traveling without navigational lights raised suspicions that the vessel was involved in drug smuggling. Id. at p. 9. Before the helicopter arrived, Officer Lopez observed that the vessel was an approximately 33-foot Eduardoño-type vessel with three occupants. Id. at p. 9. The vessel changed directions and began to travel towards the south-west towards Maunabo, after which point CBP officers requested assistance from PRPD officers and the helicopter unit to help identify the intended landing point of the vessel. Id.

In response to this request, PRPD Officer Wilfredo Vega ("Vega") met with Officer Lopez alongside Road 901 to locate the incoming vessel. Id. at p. 10. Officer Vega then went to an area

known as "Las Minas" to search for the vessel.⁵ Id. at p. 11. The PRPD helicopter unit located the vessel, and communicated its location to officers on the ground. Id. at pp. 11-12. Several minutes later, Officer Lopez joined Officer Vega at Las Minas to lead a tactical land approach towards the vessel. Id. at p. 13.

The only land access to the cove was a byway approximately three-quarters of a mile long off Road 901.⁶ Officer Lopez, Officer Vega, and the other officers turned onto the bypass, parked their vehicles, and continued on foot along a gravel trail which had no illumination. Id. at pp. 15-17. The officers used flashlights and night vision goggles. Id. at p. 17. Officer Lopez considered the area a "danger zone" because it was approximately 4:00 a.m., heavy brush surrounded the officers, and there was no illumination. Id.

---

⁵ Officer Vega has served as a police officer for 12 years, nine of which have been with the maritime division responsible for investigating drug trafficking ventures. Id. at p. 11. Las Minas was known to Officer Vega and law enforcement to be a suitable location for landing a vessel to deliver multi-kilogram drug loads. Id. HSI Special Agent Andres Bachier-Serrano ("Bachier") testified that the cove where the vessel landed on the early morning of September 17, 2012 served as a landing site for a drug smuggling venture on a previous occasion because it is a "protected cove," meaning that its view is "covered on both sides." Id.

⁶ There were houses and an asphalt path along the first .18 miles and .39 miles of the byway, respectively. Id. at p. 13. There was a gravel path with heavy brush on the remaining quarter mile to the cove. Id.

Along the gravel trail, the officers discovered an abandoned red Ford Excursion sports utility vehicle ("SUV") surrounded by approximately 15 gas tanks lined up towards the coast and other supplies such as food and drink. Id. at p. 18. The doors of the SUV were ajar, the hood was warm to the touch, and the keys were in the ignition. Id.; Docket No. 369 at p. 39. Officer Lopez and Officer Vega testified that the 15 gas tanks and supplies were particularly relevant to their investigation. Id. at p. 19. Based on their training and experience, the officers knew that drug smugglers commonly operate Eduardoño-type vessels along the southern coast of Puerto Rico, unload illegal contraband, and stock their vessels with gas and supplies for the return trip. Id. at p. 19. These observations led Officer Lopez and Officer Vega to understand that a drug smuggling venture was afoot. Id. The officers further understood that they were in imminent danger because, based on their training and experience, "[i]f there are drugs, there's weapons. If there's weapons, there's danger." Id. at p. 20.

Officer Lopez and other surveillance team members continued to the cove, where the PRPD helicopter had previously located the vessel. Id. PRPD officers informed the surveillance team that the three occupants had fled the vessel. Id. Officer Vega and Yabucoa Municipal Officer Luis Guzman remained at the abandoned SUV, which the officers believed, based on their training and

experience, to be a getaway vehicle.  Id. at p. 21.  After several minutes, Officer Vega heard a noise in a wooded area.[7]  Id.  Officer Vega used his night vision goggles to observe a moving silhouette. Id. at p. 22.  The unidentified person, defendant Mercedes, was not carrying a flashlight and there was no source of illumination other than the officer's flashlight.  Id.

Officer Vega ordered defendant Mercedes to stop, and placed his hand on his gun but did not unholster his weapon.  Id. Immediately after, Officer Vega approached defendant Mercedes, placed defendant Mercedes on the ground, and performed a security frisk.  Id. at p. 23.  To address safety concerns, Officer Vega asked defendant Mercedes how many people were with him.  Id. Officer Vega recounted that "[a]t the same time that I have him on the ground, I am searching him and I am asking him how many of you are there and how much did you get paid.  Everything at the same time."  Id.  Defendant Mercedes responded to Officer Vega that there were four individuals, and that defendant Mercedes was getting paid $1,000 to do this job.  Id.  These statements

---

[7] The First Circuit Court of Appeals concluded that the location was a "large wooded area with trails near a beach in rural Puerto Rico, and there were five or six 'well-kept' houses nearby." United States v. Mercedes-De La Cruz, 787 F.3d at 68.  Officer Vega, according to the First Circuit Court of Appeals, had "no apparent basis on which to conclude that [defendant Mercedes] was not associated with those houses."  Id.  Evidence presented at the suppression hearing indicates that the intervention occurred not by "well-kept" houses and the asphalt road, but rather in area with heavy brush on a gravel trail.  (Docket No. 382 at p. 16.)

corroborated Officer Vega's suspicions that defendant Mercedes was "involved in a criminal activity that was taking place." Id. While conducting the pat-frisk, Officer Vega found defendant Mercedes to be wet, suggesting that defendant Mercedes had contact with the newly arrived vessel. Id. at p. 24.

After assessing that defendant Mercedes had a foreign accent, was wet from the knees down, and had admitted his participation in an ongoing crime, Officer Vega raised defendant Mercedes to his feet and placed him under arrest. Id. at p. 25. Officer Vega handcuffed defendant Mercedes and read him his Miranda rights. Id. A few minutes after arresting defendant Mercedes, Officer Vega discovered 918.7 kilograms of cocaine in white bags hidden in nearby bushes from which defendant Mercedes had emerged. Id.

### III. DISCUSSION

In the R&R, the magistrate judge reached the following legal conclusions:

1. The initial detention of Mercedes was a valid Terry stop based on reasonable suspicion that criminal activity was afoot, (Docket No. 388 at pp. 6-21);

2. There was probable cause to place Mercedes under arrest based, in part, on: (1) his wet clothes, and (2) his admission in a foreign accent that he was accompanied by four other individuals, and had been paid $1,000 for his participation, Id. at 21-23; and

3.   Mercedes' statements to law enforcement officers do not constitute fruits of any illegality, and therefore should not be suppressed, Id. at 24-25).

Defendant Mercedes objects to the magistrate judge's legal conclusions.  Specifically, Mercedes asserts that there was no Terry stop, and that "the arresting officer's intervention was tantamount to being under arrest [without probable cause] from the start."  (Docket No. 394 at p. 7.)  Additionally, Mercedes argues that there was no reasonable suspicion justifying his detention.  (Id. at 10-12.)  Mercedes further contends that his statements must be suppressed because they constitute fruits of his illegal detention.

For the reasons more thoroughly discussed below, the Court is unpersuaded by Mercedes' arguments, and agrees with the legal conclusions the magistrate judge reached in her well reasoned R&R.

**A.   The initial detention of Mercedes was a valid Terry stop**

To sustain this argument, Mercedes emphasizes that his detention "was not a Terry stop" because, as the First Circuit Court of Appeals previously stated, "the government fail[ed] to identify any fact known to the agents before the arrest that would have cast suspicion on Mercedes besides the fact that he was in a 'remote area' that had 'been the site of drug smuggling over the past month.'"  Id. at 13 (quoting Mercedes-De La Cruz, 787 F.3d at 68.  This argument is unconvincing.

Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), a law enforcement officer may "briefly detain an individual for questioning if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime.'" United States v. Camacho, 661 F.3d 718, 726 (1st Cir. 2011) (quoting Arizona v. Johnson, 555 U.S. 323 (2009)). Law enforcement officers are entitled to perform pat-downs during a valid Terry stop when they have "some articulable, reasonable suspicion that the persons stopped may be dangerous." See, e.g., United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014) (citation omitted); see also United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011) ("In a world fraught with peril, officer safety must have a place at the forefront of police work. It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer has reason to believe that the suspect is armed and dangerous.") (internal quotation marks and citation omitted).

In determining whether a detention constitutes a valid Terry stop, the Court must consider whether (1) reasonable suspicion justified the stop at its inception, and (2) whether the actions of law enforcement officers during the stop were reasonably related in scope to the circumstances justifying the stop. See Tiru-Plaza, 766 F.3d at 119. The Court's inquiry is guided by a "totality of the circumstances," and is based on objective criteria, not the officer's subjective motives. United States v.

Romain, 393 F.3d 63, 71 (1st Cir. 2004). As the First Circuit Court of Appeals has observed, "reasonable suspicion is more a concept than a constant: it deals with degrees of likelihood, not with certainties or near certainties . . . [and] makes due allowance for police officers to draw upon their experience and arrive at inferences and deductions that may well elude an untrained person." United States v. Arnott, 758 F.3d 40, 44 (1st Cir. 2014) (internal quotation marks and citation omitted); Ruidiaz, 529 F.3d at 29 ("[R]easonableness requires a practical, commonsense determination – a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers.") (internal citations omitted).

The Court has no reason to disturb the magistrate judge's conclusion that the initial detention of Mercedes "was legal inasmuch as, based on the totality of the circumstances, it was reasonable to believe that Mercedes was involved in criminal activity." (Docket No. 288 at 8.) Additionally, as the magistrate judge concluded correctly, Vega's swift decision to restrain Mercedes on the ground and search him for weapons was legitimately within the scope of a Terry detention because Vega had articulable reasons to believe that Mercedes may have been armed and dangerous in light of the information available to him at that moment. (See Docket No. 388 at 17-20.)

Defendant Mercedes argues repeatedly that Officer Vega and Officer Guzman had no reason to believe that defendant Mercedes engaged in criminal behavior because prior to the arrest, "no law enforcement agent had any knowledge of the existence of bales of narcotics, or the purpose of the vessel's landing at shore." (Docket No. 394 at pp. 3, 4, 5, 8, 10, 11 & 12). Defendant Mercedes cites no authority requiring the confiscation or personal knowledge of contraband as a prerequisite for a Terry stop. The circumstances guiding the officer's actions are "not to be dissected and viewed singly; rather they must be considered as a whole." United States v. Soares, 521 F.3d 117, 120 (1st Cir. 2008) (citation omitted). The investigative stop did not occur in a vacuum.

The relevant circumstances preceding the officer's encounter with defendant Mercedes include the following facts: (1) Officer Vega received information regarding a suspicious van in the area, (2) officer Vega received information regarding an Eduardoño-type vessel located at a protected cove, (3) the protected cove was the location of previous drug smuggling

activity,[8] (4) Officer Vega observed an abandoned SUV in a wooded area, (5) there were approximately 15 gas tanks next to the SUV,[9] (5) there were food and drink supplies adjacent to the SUV, (6) the hood of the SUV was still warm, (7) the doors to the SUV were ajar, and (8) the keys were in the ignition of the SUV.  Officer Vega, a veteran CBP officer, inferred that a drug trafficking venture was underway.  (Docket No. 388.)

According to Officer Vega, he first observed defendant Mercedes in the darkness among the brush.  (Docket No. 370 at p. 46.)  Defendant Mercedes was not carrying a flashlight or recreational objects associated with fishing, camping, *etc*.  Id.  Defendant Mercedes walked toward the abandoned SUV, not along the gravel trail.  (Docket No. 370 at p. 79.)  Officer Vega observed no other individual or human activity.  Id.  Officer Vega knew

---

[8] The First Circuit Court of Appeals observed that "there is no evidence there had been previous drug encounters on the Punta Toro beach."  787 F.3d at 64.  At the suppression hearing, however, Officer Vega testified that he identified Las Minas, the area of the arrest, as an ideal location for vessels to deliver multi-kilogram drug loads.  (Docket No. 382 at p. 11.)  In fact, the cove where the vessel landed served as the landing site for smuggling ventures on several other occasions, in part because it is a "protected cove."  Id.

[9] The state in which Officer Vega and Officer Guzman discovered the SUV would "lead any officer to reasonably infer that the vehicles passengers were still in the area and were involved in the developing drug smuggling activity taking place in close proximity to the abandoned vehicle."[9]  (Docket No. 388.)  The officers concluded, with reason, that the SUV was a "get-away" vehicle.  (Docket No. 370 at p. 49.)

that the Eduardoño-type vessel had approached the protected cove approximately 500 feet away and had at least three occupants, and that a fourth suspect drove the SUV. (Docket No. 370 a p. 75.) The PRPD helicopter had informed Officer Vega that the three occupants of the vessel fled towards the shore and remained at large. (Docket No. 369 at pp. 84-85.) Officer Vega instructed defendant Mercedes to stop, placed defendant Mercedes on the ground and conducted a security frisk.[10] (Docket No. 388 at p. 17.) These actions constitute a Terry stop, not an arrest. See United States v. Taylor, 162 F.3d 12 (1st Cir. 1998) (holding that officer's action of putting suspects on the ground and searching for weapons was within the scope of a Terry stop). The facts known to the arresting officers supported a "reasonable, particularized suspicion that [defendant Mercedes was] committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough" to establish reasonable suspicion.). Officer Vega

---

[10] Officer Vega testified that he ordered defendant Mercedes "to stop, police, hands up. Throw him to the ground. Have him detained. Put his hands behind his back. And for security, because it was a secluded area, and I don't know how many of them are around, and I assume that there were many of them, because there were a lot of gallons, and that was too much movement for just one person." (Docket No. 370 at p. 57.)

had reasonable suspicion in surmise that defendant Mercedes was participating in a drug smuggling venture.[11]

### B. Officer Vega and Officer Guzman had probable cause to arrest defendant Mercedes

After conducting the Terry stop, Officer Vega and Officer Guzman had probable cause to arrest defendant Mercedes. Pursuant to the Fourth Amendment, a warrantless arrest is permissible "where there is probable cause, i.e., where reasonably trustworthy facts and circumstances would enable a reasonably prudent person to believe that the arrestee has committed a crime (even if it differs from the one named by police during the arrest or booking)." Robinson v. Cook, 706 F.3d 25, 33 (1st Cir. 2013) (citation omitted). "Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, no legal technicians, act." United States v. Vongkaysone, 434 F.3d 68, 73-74 (1st Cir. 2006).

---

[11] The First Circuit Court of Appeals cited to a number of facts in their analysis of the Terry stop that suggested Officer Vega and Officer Guzman acted without reasonable suspicion. Evidence not in the record from the second trial, and not relied upon by the First Circuit Court of Appeals in their determination that defendant Mercedes' would likely prevail on the motion to suppress, includes evidence that: (1) the hood to the SUV was still warm, (2) the doors to the SUV were ajar, (3) the key remained in the ignition, (4) the PRPD officers in the helicopter reported that the three occupants of the vessel had fled, and that (5) defendant Mercedes did not have a flashlight. United States v. Mercedes-De La Cruz, 787 F.3d 61, 64 (1st Cir. 2015).

Once Officer Vega placed defendant Mercedes on the ground and preformed a security frisk, Officer Vega observed defendant Mercedes to be wet from the knees down. (Docket No. 370 at p. 51). Officer Vega "proceeded to search [defendant Mercedes] for safety, asking him how many were they. He said four." Id. Officer Vega also asked defendant Mercedes how much defendant was paid. (Docket No. 370 at pp. 65-86.) Defendant Mercedes answered that he was paid $1,000. Id. These additional facts provided Officer Vega and Officer Guzman with probable cause to arrest defendant Mercedes. Consequently, the Court concurs with the magistrate judge's finding that Officer Vega's "interaction with [defendant Mercedes] started less than an arrest and evolved into an arrest based on probable cause as a result of the findings during the Terry stop." (Docket No. 388 at p. 24.)

**C. Statements and evidence obtained during the Terry stop are not fruits of an illegal arrest**

Defendant Mercedes asserts that statements regarding his involvement in the drug smuggling venture and evidence that his clothes were wet are inadmissible as products of unconstitutional conduct. (Docket No. 394 at p. 12); citing Wong Sun v. United States, 371 U.S. 471, 484 (1963). The Court disagrees. The Terry stop of defendant Mercedes was based on reasonable suspicion, and the ensuing arrest was based on probable cause. Consequently,

defendant Mercedes' request to suppress this evidence as fruits of an illegal arrest is meritless.

**IV. CONCLUSION**

The Court has independently reviewed the entire record of this case, including the transcript of the two-day hearing, the evidence admitted at the hearing, and the defendant Mercedes' objections, as well as the applicable legal authority. The Court **ADOPTS IN FULL** the magistrate judge's R&R, (Docket No. 388), and **DENIES** defendant Mercedes' motion to suppress, (Docket No. 349).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 15, 2017.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT